UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rachael Joseph,

      Plaintiff,

v.

Department of Public Safety (State of Minnesota);
Commissioner Bob Jacobson (in his official and
individual capacity); Jordan Haltaufterheid (in
his official and individual capacity); Kim Babine
(in her official and individual capacity); and
Rebecca Rabb (in her official and individual
capacity),

      Defendants.

Case No.: 26-cv-18 (JWB/SGE)

## AMENDED COMPLAINT
## (JURY DEMAND)

Plaintiff brings this civil rights action against Defendants through counsel at Premo Frank PLLC.

**PARTIES**

1. Plaintiff Rachael Joseph is an adult individual who resides in Hennepin County, Minnesota.

2. Defendant Minnesota Department of Public Safety ("DPS" or "the Department") is an agency of the State of Minnesota. According to DPS, its core mission is to "build a safer Minnesota." DPS headquarters are located in St. Paul, Ramsey County, Minnesota.

1

3.  On information and belief, Defendant DPS Commissioner Bob Jacobson is an adult individual who resides in Ramsey County and is domiciled in the State of Minnesota. He is in charge of DPS.

4.  On information and belief, Defendant Jordan Haltaufterheid is an adult individual who resides and is domiciled in the State of Minnesota. Haltaufterheid is the Chief of Staff to DPS Commissioner Bob Jacobson and supervised Plaintiff's employment.

5.  On information and belief, Defendant Rebecca Rabb is an adult individual who resides and is domiciled in the State of Minnesota. Rabb is the Deputy Director of External Relations, supervised Plaintiff's employment, and reports to Haltaufterheid and Jacobson.

6.  On information and belief, Defendant Kim Babine is an adult individual who resides and is domiciled in the State of Minnesota. Babine is now the Director of the Office of Justice Programs and reports to Haltaufterheid and Jacobson.

7.  At all relevant times, Plaintiff was an employee of DPS.

## JURISDICTION AND VENUE

8.  Following removal to federal court by Defendants, this Court has personal jurisdiction over Defendants, subject-matter jurisdiction over Plaintiff's federal claims, and supplemental jurisdiction over Plaintiff's state claims. Venue is also proper here.

9.  At commencement, this case was located in Ramsey County District Court, which had personal jurisdiction over Defendants and original subject-matter jurisdiction over Plaintiff's claims. Venue was also proper in Ramsey County because DPS resides there, and, separately, because at least some of the events giving rise to Plaintiff's claims occurred there.

## FACTS

*Plaintiff's Aunt Shelley.*

10.     Plaintiff's aunt, Shelley Joseph-Kordell ("Aunt Shelley"), worked as a geriatric care manager in the Twin Cities. Her clients were elderly adults and couples who needed assistance with daily living.

11.     In the early 2000s, a disturbed and disgruntled daughter of one such couple started harassing Aunt Shelley. Her name was Susan Berkovitz. Berkvovitz began threatening Shelley, leaving dead animals on her doorstep, and filing frivolous court cases against her.

12.     On September 29, 2003, Aunt Shelley went to the Hennepin County Government Center for a hearing in one of the frivolous cases.

13.     Fearing Berkovitz, Shelley and her lawyer requested security to escort them to the courtroom on the 17th floor of the Government Center. At the time, there were no metal detectors in the building.

14.     After arriving on the 17th floor, Shelley went to the women's restroom and asked security to guard the door.

15.     Shelley's lawyer remained in the hallway outside the courtroom.

16.     As he looked down to leaf through documents in his briefcase, Berkovitz walked up and shot him in the neck. He survived.

17.     Moments later, however, Berkovitz entered the women's restroom unimpeded and shot Shelley to death.

*Plaintiff Rachael Joseph.*

18.     Plaintiff Rachael Joseph is a Jewish woman with a young family.

19. Since the murder of her Aunt Shelley, Joseph has suffered from PTSD relating to gun violence.[1]

20. Following the murder, Joseph and her family—led by Geri Joseph, Plaintiff's grandma and Aunt Shelley's mom—campaigned to get Hennepin County to install metal detectors at the Hennepin County Government Center. They succeeded.

21. Years later, Joseph began working to shape the law in ways to prevent people from becoming victims of gun violence like her Aunt Shelley.

22. Over the past decade, Joseph has:

- Drafted and consulted on gun safety legislation in Minnesota;

- Organized and participated in public campaigns a) supporting legislation to reduce gun violence (e.g., universal background check and ERPO laws[2]) and b) opposing legislation that risked increasing gun violence (e.g., permitless carry and stand-your-ground laws);

- Authored editorials, interviewed with news media, engaged in public debate on social media, spoken at public rallies, and testified in public hearings relating to gun violence legislation;

- Developed and provided survivor- and trauma-informed trainings for public agencies, organizations, and community groups; and

---

[1] Joseph's PTSD is public knowledge. It was also a topic of discussion (e.g., as trauma or "lived experience" relating to gun violence) during her hiring process at DPS.
[2] ERPO stands for "Extreme Risk Protection Order." *See* paragraph 23 below for more information about ERPOs.

- Educated law enforcement and local stakeholders on ERPO laws.

***DPS hires Rachael Joseph as ERPO Coordinator.***

23. Beginning in 2024, Minnesotans have been able to petition a court for an ERPO prohibiting a person from purchasing or possessing a firearm during a period of crisis when the person poses an extreme risk to themselves or others.

24. A year or so later, in spring 2025, DPS began soliciting applications for an ERPO Coordinator position. The purpose of the ERPO Coordinator position was to provide statewide coordination, education, and support for Minnesota's new ERPO law. The position had nothing to do with confiscating guns in particular cases.

25. Joseph applied for the job.

26. On or around June 4, 2025, Joseph interviewed with Jordan Haltaufderheid (DPS Chief of Staff), Rebecca Rabb (DPS Deputy Director of External Relations), and Tony Benson (DPS Communications Specialist).

27. A few weeks later, on or around June 25, 2025, Joseph sat for a second interview: this time with Haltaufderheid, Rabb, and Suzanne Elwell (DPS Director of the Crime Victim Justice Unit).

28. DPS thoroughly vetted candidates for the role of ERPO Coordinator. Of the 30 people who applied, DPS concluded that only 5 were at least minimally qualified, and, ultimately, that Joseph was the best candidate for the job.

29. When evaluating Joseph for the position, DPS concluded the following about her qualifications for the job:

- Joseph has "extensive knowledge on Minnesota's ERPO laws";

5

- Joseph has been "heavily involved in [related] policy changes, legislative advocacy, community partnership and training"; and

- Joseph's background and experience—evaluating public programs, advancing trauma informed services, developing and delivering training—"will be extremely valuable to this position[.]"

30. More generally, DPS concluded that it is "very hard to find" people with the "background and experience required for this position," and, further, that "we need to offer [Joseph] the best possible salary to not lose such a qualified candidate."

31. On or around July 15, 2025, the Department sent a letter to Joseph confirming her hire as ERPO Coordinator for the State of Minnesota in the Department's Office of Justice Programs.

32. On August 13, 2025, Joseph started her job as ERPO Coordinator. During Joseph's first week on the job, DPS officials (including Rabb and Haltaufterheid) celebrated her expertise, introduced her as having "lived experience" relating to gun violence, and expressed how glad they were to have her on board.

33. Throughout Joseph's employment with DPS, she worked well with the Department's ERPO partners.

***The Minnesota Gun Owners Caucus and its followers launch a defamatory campaign to get Joseph, their long-time political opponent, fired from DPS.***

34. The Minnesota Gun Owners Caucus is a non-profit organization that claims its mission is to "defend and restore the right to keep and bear arms in Minnesota."

35.     The organization, its leadership, and their followers have long identified Joseph as their political opponent.

36.     For example, whereas Joseph publicly advocated for passage of Minnesota's ERPO law, the Gun Owners Owners Caucus and their followers vehemently and publicly advocated against passage of the law.

37.     Beginning on or around August 31, 2025, the Gun Owners Caucus and its followers launched a defamatory campaign to get Joseph fired from DPS. They did so because of Joseph's long record in politics on the opposing side of legislation relating to gun violence, and, more specifically, because they did not want the ERPO law to succeed.

38.     On information and belief, at the time the Gun Owners Caucus and its followers launched their campaign against Joseph, the organization itself was in the process of negotiating a large six-figure settlement with DPS in an unrelated case.

39.     When Joseph discovered the campaign against her, she alerted her superiors at DPS. They never responded.

40.     When DPS Commissioner Bob Jacobson initially learned about the campaign against Joseph, he reacted by saying, "Well that's interesting." Commissioner Jacobson never reached out to Joseph to see if she was okay.

41.     Early on the morning of September 8, 2025, Joseph received a message from a friend about a potential threat to her safety relating to the campaign to get her fired.

42.     Joseph's friend informed her that a person had attempted to post an antisemitic comment about Joseph online in response to a 2017 article on www.tcjewfolk.com. The message read: "How is

this **nutjob** in charge of **red flag confiscation** in MN now? Don't even get started on the **Jewish side** of things for her. . . . This woman . . . should never be allowed in any type of authority at all," (emphasis added).

43. Around 9:18 a.m. that morning, Joseph passed this information on to her superiors at DPS. She let them know that the situation involving the Gun Owners Caucus and its followers was escalating, and, thus, that she was in the process of seeking an attorney for assistance.

44. Two minutes later, around 9:20 a.m., Chief of Staff Haltaufderheid forwarded Joseph's email to Cassandra O'Hern (Deputy Commissioner) and Timothy Lynaugh (Assistant Commissioner).

45. Haltaufderheid did not express concern for Joseph in the email. Nor did he solicit feedback or assistance from O'Hern or Lynaugh. All he said was: "FYSA," which meant, "For your situational awareness."

46. Still, Deputy Commissioner O'Hern replied: declaring that "we need to make sure that [Joseph] has all the EAP resources she needs," and asking whether they should forward the information to "Fusion." But DPS did neither.

47. On information and belief, by Fusion, O'Hern was referring to the Minnesota Fusion Center, which is a division of the Minnesota BCA that works with law enforcement, first responders, government agencies, and the private sector to share "resources, expertise, and information with the goal of maximizing their ability to detect, prevent, investigate, and respond to criminal . . . activity."

48. Meanwhile, members of the Gun Owners Caucus and its followers were posting increasingly threatening comments about Joseph online. For example:

- Joseph is "evil," "full Gestapo," a "paid terrorist," a "traitor," and a "Red Flag transvestite";

- "Time to stop being nice and polite!"

- "This means WAR!!!";

- "I AM PAST THE POINT OF JUST WANTING [HER] IN PRISON," *next to a photo of a hangman's platform and noose*;

- Give her "both barrels";

- "Light her up!" and

- "Tell that twatwaffle bitch to leave her doors unlocked at night. Let's see how she feels after that."

49. By the end of the day on September 8, 2025, Joseph had reported concerns about the campaign against her to superiors at DPS, Human Resources at DPS, and the Office of the Minnesota Attorney General.

50. In fear for the safety of herself and her family, Joseph had also filed a petition for a harassment restraining order (HRO) against the Gun Owners Caucus and its followers.

51. Incredibly, neither Haltaufderheid nor Rabb nor anyone else at DPS ever so much as acknowledged receipt of Joseph's concerns about the campaign against her, much less followed up to understand her concerns in more depth or provide her with any resources.

52. The next morning, September 9, 2025, Joseph informed DPS that she was planning to work from home while waiting for a decision on her petition for an HRO.

53. A few hours later, Kim Babine scheduled a virtual meeting with Joseph for 2:30 p.m. that afternoon. Babine did not explain the reason for the meeting.

54. When Joseph arrived for the meeting, Director Babine fired her.[3]

55. Babine claimed that DPS had concluded that Joseph has "an **inability** to build relationships with partners."

56. When Joseph asked, "Which partners?", Babine could not name any. Then, when Joseph suggested that DPS appeared to be taking the side of people who wanted the ERPO law to fail, Babine responded with silence.

57. Not only did DPS appear to be crediting the Gun Owners Caucus and their followers' political preferences when firing Joseph, they also appeared to have bought into the stereotype that Joseph was a "nutjob" with PTSD who has what they themselves described as "an **inability** to build relationships."[4] This would of course render Joseph unable to perform a whole class of jobs, namely, those that require her to build relationships with people.

58. On information and belief, Babine did not terminate Joseph by herself. She did so at the direction of Joseph's direct supervisor (Rabb), Rabb's superior (Haltaufderheid), and Haltaufderheid's direct supervisor (Jacobson), or, at minimum, with their approval.

59. On information and belief, Babine did not come up with a purported reason for terminating Joseph by herself. She did so at the direction of Joseph's direct supervisor (Rabb), Rabb's superior

---

[3] This was the first time Babine had even spoken with Joseph since briefly welcoming her to the job in August.
[4] Liability may thus attach to DPS (i) directly or (ii) indirectly via a Cat's Paw theory of the sort described in *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).

(Haltaufderheid), and Haltaufderheid's direct supervisor (Jacobson), or, at minimum, with their approval.

60. Before terminating Joseph, DPS never disciplined Joseph for failing to build relationships with ERPO partners.

61. Before terminating Joseph, DPS never warned her about failing to build relationships with ERPO partners.

62. Before terminating Joseph, DPS never coached her on the ability to build relationships with ERPO partners.

63. And, before terminating Joseph, DPS never so much as suggested that she was somehow failing to build relationships with ERPO partners.

64. More broadly, before terminating Joseph, DPS never suggested that *any* aspect of her performance as ERPO Coordinator was unsatisfactory.

65. Following her termination, Joseph made a Data Practices Act request for all documents relating to her employment at DPS.

66. In response, DPS failed to produce a single document suggesting that Joseph had any performance problems. Likewise, DPS failed to produce a single document reflecting the process it went through when deciding to terminate Joseph, who was involved in the decision, and why they did it.

67. In any case, the reason DPS gave for Joseph's termination is both false and pretextual.

68. Indeed, in the months following her termination, Joseph was invited as a private citizen by the Mayor of Mounds View to speak about ERPO at an educational town hall.

69. Joseph appeared in Mounds View on a panel that included Minnesota Attorney General Keith Ellison. Her appearance and presentation were similar to the work she was tasked with doing as ERPO Coordinator at DPS.

70. Followers of the Gun Owners Caucus attended the event. They sat in the crowd leering at Joseph, took photographs of her, and again declared on social media that she is an "**anti-gun activist nut**."

71. Others commended Joseph for her work. This included Attorney General Ellison: who praised Joseph's presentation, gave her a business card, and even invited her to connect with his Office about ERPO.

72. As a result of Defendants' conduct, Plaintiff has suffered economic loss (including lost wages and benefits), emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, lost earning capacity, and other injuries.

## CAUSES OF ACTION

### Count I
*Retaliation in violation of*
*Minn. Stat. Section 181.931 et seq.*
(DPS)

73. Plaintiff incorporates all of the foregoing allegations as if stated herein.

74. Section 181.931 *et seq.* prohibits employers from firing employees because they communicate about a suspected, actual, or planned violation of law, whether committed by the employer or a third party.

75. As alleged herein, Defendant was Plaintiff's employer.

76. As alleged herein, Plaintiff reported concerns about suspected, actual, or planned violations of law by the Gun Owners Caucus, its officers, or its followers. These violations of law include, but are not limited to, economic reprisal, tortious interference with employment, defamation, misuse of a charity, and crimes against a person.

77. As alleged herein, Defendant fired Plaintiff because she reported suspected, actual, or planned violations of law.

78. In doing so, Defendant acted with deliberate disregard for the rights or safety of others.

79. As a result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including the loss of income and benefits), emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, and lost earning capacity.

## Count II
*Retaliation in Violation of*
*The First Amendment and 42 U.S.C. § 1983*
(DPS, Bob Jacobson, Kim Babine, Jordan Haltaufterheid, and Rebecca Rabb)

80. Plaintiff incorporates all of the foregoing allegations as if stated herein.

81. The U.S. Constitution prohibits public employers from firing public employees because they exercise their First Amendment right to free speech.

82. As alleged herein, Defendant was Plaintiff's employer.

83. As alleged herein, Plaintiff exercised her right to free speech under the First Amendment by speaking on matters of public concern relating to legislation and public policy on gun violence.

13

84. At all relevant times, when deciding to fire Plaintiff, Defendants had final policy-making authority on the decision and took such action under color of state law.

85. As alleged herein, Defendants fired Plaintiff because she exercised her right to free speech under the First Amendment.

86. In doing so, Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights.

87. As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including the loss of income and benefits), emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, and lost earning capacity.

88. In so far as this claim is against people in their official capacities, DPS, or the State of Minnesota, Plaintiff does not seek money damages, but only declaratory, injunctive, or other available relief.

**Count III**
*Disability Discrimination in Violation of*
*Minn. Stat. §§ 363A.01 et seq. (MHRA)*
(DPS)

89. Plaintiff incorporates all of the foregoing allegations as if stated herein.

90. The MHRA prohibits employers from firing employees because of disability.

91. As alleged herein, Defendant was Plaintiff's employer.

92. As alleged herein, Defendant regarded Plaintiff as having a disability.

93. As alleged herein, Defendant fired Plaintiff because of disability.

94. In doing so, Defendant acted with deliberate disregard for the rights or safety of others.

95. As a result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including the loss of income and benefits), emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, and lost earning capacity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on claims in this matter.

## REQUEST FOR RELIEF

Based on this Complaint, Plaintiff hereby requests the Court to order judgment in her favor and against Defendants by:

A. Declaring Defendants' conduct to be in violation of Plaintiff's rights under state and federal law;

B. Awarding damages to Plaintiff in an amount greater than $75,000 for:
    - Economic loss including the loss of past and future income and benefits; and
    - Emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, and lost earning capacity.

C. Awarding liquidated damages to Plaintiff as required or permitted by law;

D. Awarding treble damages to Plaintiff as required or permitted by law;

E. Awarding punitive damages to Plaintiff as required or permitted by law;

F. Imposing statutory damages or civil penalties on Defendants as required or permitted by law;

G. Awarding reasonable attorneys' fees, costs, and disbursements to Plaintiff as required or permitted by law;

H. Awarding pre- and post-judgment interest to Plaintiff as required or permitted by law; and

I. Granting any additional relief to Plaintiff deemed equitable and just by the Court.

Date: January 27, 2026                    *s/Matthew A. Frank*
                                                Matthew A. Frank (MN# 0395362)
                                                matt@premofrank.com
                                                (612) 445-7041
                                                Stephen M. Premo (MN# 0393346)
                                                stephen@premofrank.com
                                                (612) 445-7042
                                                401 Minneapolis Grain Exchange
                                                400 South Fourth Street
                                                Minneapolis, MN 55415