## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Rachael Joseph,

       Plaintiff,                         Case No.: 26-cv-18 (JWB/SGE)

v.

Department of Public Safety (State of Minnesota);
Commissioner Bob Jacobson (in his official and
individual capacity); Jordan Haltaufterheid (in
his official and individual capacity); Kim Babine
(in her official and individual capacity); and
Rebecca Rabb (in her official and individual
capacity),

       Defendants.

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
### DEFENDANTS' PARTIAL MOTION TO DISMISS

### <u>INTRODUCTION</u>

The Minnesota Department of Public Safety hired Plaintiff Rachael Joseph after an

exhaustive vetting process concluded that she was uniquely qualified to facilitate the

implementation of Minnesota's new Extreme Risk Protection Order ("ERPO") law. Less than

a month later, DPS abruptly terminated her following a campaign by the Minnesota gun lobby

to get Joseph—their long-time political opponent—fired. As alleged in Plaintiff's Amended

Complaint, DPS offered a false and pretextual reason for the termination. The truth is that DPS acted at the behest of the gun lobby.

Defendants' partial motion to dismiss must be denied in its entirety because their arguments are meritless. First, sovereign immunity does not bar Section 1983 claims, like Plaintiff's, that seek declaratory and injunctive relief. Second, based on specific factual allegations in the complaint, Defendants are well aware of the nature of Plaintiff's claims and the grounds on which they rest.

## STATEMENT OF FACTS

### *The Parties.*

Defendant Minnesota Department of Public Safety ("DPS" or "the Department") is an agency of the State of Minnesota. The core mission of DPS is to "build a safer Minnesota." Plaintiff's Amended Complaint ("Amend. Comp.") (Doc. 10), at ¶2. Defendant DPS Commissioner Bob Jacobson is in charge of DPS. Amend. Comp. at ¶3. Defendant Jordan Haltaufterheid is the Chief of Staff to DPS Commissioner Bob Jacobson and supervised Plaintiff's employment. *Id.* at ¶4. Defendant Rebecca Rabb is the Deputy Director of External Relations, supervised Plaintiff's employment, and reports to Haltaufterheid and Jacobson. *Id.* at ¶5. Defendant Kim Babine is the Director of the Office of Justice Programs and reports to Haltaufterheid and Jacobson. *Id.* at ¶6.

2

Plaintiff Rachael Joseph is a Jewish woman with a young family. In September 2003, Joseph's Aunt Shelley was shot and killed at the Hennepin County Government Center by a person who had been long-been harassing her. Following the murder, Joseph and her family campaigned to get Hennepin County to install metal detectors at the Hennepin County Government Center. They succeeded. Since the murder of her Aunt Shelley, Joseph has suffered from PTSD. *Id.* at ¶¶18–20.

For the past decade, Joseph has worked tirelessly to shape Minnesota law to prevent people from becoming victims of gun violence like her Aunt Shelley. Joseph's public advocacy has included:

- Drafting and consulting on gun safety legislation in Minnesota;

- Organizing and participating in public campaigns a) supporting legislation to reduce gun violence (e.g., universal background check and ERPO laws[1]) and b) opposing legislation that risked increasing gun violence (e.g., permitless carry and stand-your-ground laws);

- Writing editorials, interviewing with news media, engaging in public debate on social media, speaking at public rallies, and testifying in public hearings relating to gun violence legislation;

---

[1] ERPO stands for "Extreme Risk Protection Order."

    ○   Developing and providing survivor- and trauma-informed trainings for public agencies, organizations, and community groups; and

    ○   Educating law enforcement and local stakeholders on ERPO laws.

*Id.* at ¶¶21–22. Over the course of her public advocacy, the fact that Joseph has PTSD relating to gun violence has become public knowledge. *Id.* at ¶19 at fn.1.

### DPS hires Joseph as its first ERPO Coordinator.

Since 2024, Minnesotans have had the right to petition a court for an ERPO prohibiting a person from purchasing or possessing a firearm during a period of crisis when that person poses an extreme risk to themselves or others. By spring 2025, DPS began soliciting applications for an ERPO Coordinator position. The purpose of the ERPO Coordinator position was to provide statewide coordination, education, and support for Minnesota's new ERPO law. The position had nothing to do with confiscating guns in particular cases. Joseph applied for the job. *Id.* ¶¶23–25.

In 2025, Joseph sat for two interviews at DPS for the ERPO Coordinator position. Jordan Haltaufderheid (DPS Chief of Staff) and Rebecca Rabb (DPS Deputy Director of External Relations) participated in both interviews. DPS thoroughly vetted candidates, including Joseph, for the role. Of the 30 people who applied, DPS concluded that only 5 were qualified, and, ultimately, that Joseph was the best candidate for the job. *Id.* at ¶¶26–28.

When evaluating Joseph for the position, DPS concluded the following about her qualifications for the job:

○ Joseph has "extensive knowledge on Minnesota's ERPO laws";

○ Joseph has been "heavily involved in [related] policy changes, legislative advocacy, community partnership and training"; and

○ Joseph's background and experience—evaluating  public programs, advancing trauma informed services, developing and delivering training—"will be extremely valuable to this position[.]"

More generally, DPS concluded that it is "very hard to find" people with the "background and experience required for this position," and, further, that "we need to offer [Joseph] the best possible salary to not lose such a qualified candidate." *Id.* at ¶¶29–30.

On August 13, 2025, Joseph started her job as ERPO Coordinator. During Joseph's first week on the job, DPS officials (including Rabb and Haltaufterheid) celebrated her expertise, introduced her as having "lived experience" relating to gun violence, and expressed how glad they were to have her on board. Throughout her employment at DPS, Joseph worked well with the Department's ERPO partners. *Id.* at ¶¶31–33.

***The Minnesota Gun Owners Caucus and its followers launch a defamatory campaign to get Joseph, their long-time political opponent, fired from DPS.***

Beginning on or around August 31, 2025, the Minnesota Gun Owners Caucus and its followers (the ("Gun Caucus") launched a defamatory campaign to get Joseph fired from DPS.

They did so because of Joseph's long record in politics on the opposing side of legislation relating to gun violence, and, more specifically, because they did not want the ERPO law to succeed. People in the Gun Caucus have long identified Joseph as their political opponent. For example, whereas Joseph publicly advocated for passage of Minnesota's ERPO law, the Gun Caucus vehemently advocated against passage of the law. Notably, at the time the Gun Caucus launched its campaign against Joseph, DPS was in the process of negotiating a large six-figure settlement with the Gun Caucus in an unrelated case. *Id.* at ¶¶34–38.

When Joseph discovered the campaign against her, she alerted her superiors at DPS. When DPS Commissioner Bob Jacobson learned about the campaign against Joseph, he reacted by saying, "Well that's interesting." Commissioner Jacobson never reached out to Joseph to see if she was okay. *Id.* at ¶¶39–40. Early on the morning of September 8, 2025, Joseph received a message from a friend about a potential threat to her safety relating to the campaign to get her fired.  Specifically, Joseph's friend informed her that a person had attempted to post an antisemitic comment about Joseph online in response to a 2017 article on www.tcjewfolk.com. The message read:

> "How is this **nutjob** in charge of **red flag confiscation** in MN now? Don't even get started on the **Jewish side** of things for her. . . . This woman . . . should never be allowed in any type of authority at all."

*Id.* at ¶¶41–42 (emphasis added).

Around 9:18 a.m. that morning, Joseph passed this information on to her superiors at DPS. She let them know that the situation involving the Gun Caucus and its followers was escalating, and, thus, that she was in the process of seeking an attorney for assistance. Two minutes later, around 9:20 a.m., Chief of Staff Haltaufderheid forwarded Joseph's email to Cassandra O'Hern (Deputy Commissioner) and Timothy Lynaugh (Assistant Commissioner). *Id.* at ¶¶43–44. Haltaufderheid did not express concern for Joseph in the email. Nor did he solicit feedback or assistance from O'Hern or Lynaugh. All he said was: "FYSA," which meant, "For your situational awareness." Still, Deputy Commissioner O'Hern replied: declaring that "we need to make sure that [Joseph] has all the EAP resources she needs," and asking whether they should forward the information to "Fusion." But DPS did neither. *Id.* at ¶¶45–47.

Meanwhile, members of the Gun Caucus and their followers were posting increasingly threatening comments about Joseph online. For example:

- Joseph is "evil," "full Gestapo," a "paid terrorist," a "traitor," and a "Red Flag transvestite";

- "Time to stop being nice and polite!"

- "This means WAR!!!";

- "I AM PAST THE POINT OF JUST WANTING [HER] IN PRISON," *next to a photo of a hangman's platform and noose*;

- Give her "both barrels";

- ○ "Light her up!" and

- ○ "Tell that twatwaffle bitch to leave her doors unlocked at night. Let's see how
    she feels after that."

*Id.* at ¶48. By the end of the day on September 8, 2025, Joseph had reported concerns about the Gun Caucus campaign to her superiors at DPS, Human Resources at DPS, and the Office of the Minnesota Attorney General. Fearing for the safety of herself and her family, Joseph had also filed a petition for a harassment restraining order (HRO). Nobody at DPS ever so much as acknowledged receipt of Joseph's concerns about the campaign against her, much less followed up to understand her concerns in more depth or provide her with assistance. *Id.* at ¶¶49–51.

The next morning, September 9, 2025, Joseph informed DPS that she was planning to work from home while waiting for a decision on her petition for an HRO. A few hours later, Kim Babine scheduled a virtual meeting with Joseph for 2:30 p.m. that afternoon. Babine did not explain the reason for the meeting. When Joseph arrived for the meeting, Babine fired her. Babine claimed that DPS had concluded that Joseph has "an **inability** to build relationships with partners." This was the first time Babine had even spoken with Joseph since briefly welcoming her to the job in August. *Id.* at ¶¶52–55 (including fn.3).

When Joseph asked, "Which partners?", Babine could not name any. Then, when Joseph suggested that DPS appeared to be taking the side of people who wanted the ERPO law to fail, Babine responded with silence. Not only did DPS appear to be crediting the Gun

8

Owners Caucus and their followers' political preferences when firing Joseph, they also appeared to have bought into the stereotype that Joseph was a "nutjob" with PTSD who has what they themselves described as "an **inability** to build relationships." This would of course render Joseph unable to perform a whole class of jobs, namely, those that require her to build relationships with people. *Id.* at ¶¶56–59.

Before terminating Joseph, DPS never disciplined Joseph for failing to build relationships with ERPO partners. Before terminating Joseph, DPS never warned her about failing to build relationships with ERPO partners. Before terminating Joseph, DPS never coached her on the ability to build relationships with ERPO partners. And before terminating Joseph, DPS never so much as suggested that she was somehow failing to build relationships with ERPO partners. Indeed, before terminating Joseph, DPS never suggested that *any* aspect of her performance as ERPO Coordinator was unsatisfactory. *Id.* at ¶¶60–64.

Following her termination, Joseph made a Data Practices Act request for all documents relating to her employment at DPS. In response, DPS failed to produce a single document suggesting that Joseph had any performance problems. Likewise, DPS failed to produce a single document reflecting the process it went through when deciding to terminate Joseph, who was involved in the decision, and why they did it. *Id.* at ¶¶65–66.

The reason DPS gave for Joseph's termination is both false and pretextual. Indeed, in the months following her termination, Joseph was invited as a private citizen by the Mayor of

Mounds View to speak about ERPO at an educational town hall. Joseph appeared in Mounds View on a panel that included Minnesota Attorney General Keith Ellison. Her appearance and presentation were similar to the work she was tasked with doing as ERPO Coordinator at DPS. People in the Gun Caucus attended the event. They sat in the crowd leering at Joseph, took photographs of her, and declared on social media that she is an "anti-gun activist nut." But others at the event commended Joseph, including Attorney General Ellison, who praised Joseph's presentation, gave her a business card, and invited her to connect with his Office about ERPO. *Id.* at ¶¶ 67–71.

## LEGAL STANDARD

Federal pleading rules call only for "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2). They do not "countenance dismissal" based on "technicalities." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). All that a plaintiff must do in a complaint is describe "simply, concisely, and directly" the events that might entitle them to relief. *Id.* at 12. As the Supreme Court emphasized in *Twombly*, to survive a motion to dismiss, a complaint need only give defendants "fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). That said, merely reciting the "legal elements" of a theoretical claim is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must contain "enough facts to state a claim to relief that is *plausible* on its face."

*Twombly*, 550 U.S. at 570 (emphasis added). Plausibility, however, is *not* a probability requirement. *Id.* at 556. A claim can be plausible even if it appears the facts alleged in the complaint are "improbable, and that recovery is very remote and unlikely." *Id.* (internal quotations and citations omitted).

Moreover, a plaintiff's employment claim can be plausible even if the complaint does not allege "specific facts" proving the elements of a *prima facie* case, much less all elements of the claim. *EEOC v. BNSF Ry. Co.*, 150 F.4th 948, 961–62 (8th Cir. 2025), *reh'g denied*, No. 24-2082, 2025 WL 3085999 (8th Cir. Nov. 5, 2025) (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002)); *see also Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017); *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) ("The prima facie standard is an evidentiary standard, not a pleading standard.") (quoting *Rodriguez–Reyes v. Molina–Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013)); *Lopez Prater v. Trs. of Hamline Univ. of Minnesota*, 693 F. Supp. 3d 1009, 1023 (D. Minn. 2023).

After all, as explained by the Supreme Court in *Swierkiewicz* and reaffirmed by the Eighth Circuit in *Wilson*, the "simplified notice pleading standard relies on liberal discovery rules and *summary judgment motions* to define disputed facts and issues and to dispose of unmeritorious claims." *Wilson*, 850 F.3d at 372–73 (emphasis original) (quoting *Swierkiewicz*, 534 U.S. at 512). Finally, courts must take the factual allegations in the complaint as true, view

them in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

## ARGUMENT

I.  **Plaintiff has stated Section 1983 claims against DPS and its officials in their individual capacities for violation of her First Amendment rights.[2]**

A.  **Sovereign immunity does not bar Joseph's Section 1983 claim against DPS because she is only seeking declaratory and injunctive relief from DPS based on that claim.**

DPS seeks dismissal of Plaintiff's Section 1983 claim against public officials in their official capacities based on sovereign immunity. Defendants' Memorandum of Law in Support of Partial Motion to Dismiss Amended Complaint ("Defs.' Memo.") (Doc. 16), at 7–8. But sovereign immunity does *not* bar federal claims "seeking declaratory and injunctive relief against state officers." *Mahn v. Jefferson Cnty., Missouri*, 891 F.3d 1093, 1099 (8th Cir. 2018) (quoting *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269 (1997) (explaining the contours sovereign immunity set forth in *Ex Parte Young*, 209 U.S. 123 (1908)). In particular, sovereign immunity does *not* bar claims where a plaintiff seeks declaratory relief that her employment was "terminated in violation of the First Amendment of the United States Constitution" and related injunctive relief (such as reinstatement to her position). *Mahn*, 891 F.3d 1093, 1099 (8th Cir. 2018); *see also Treleven v. Univ. of Minnesota*, 73 F.3d 816, 819 (8th Cir. 1996);

---

[2] For brevity, Plaintiff will use "claims against DPS" to refer to claims against DPS officials in their official capacities.

*Nelson v. University of Texas at Dallas*, 535 F.3d 318, 322 (5th Cir. 2008) (collecting analogous cases from the Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, and Tenth Circuits).

Here, Defendants' Rule 12 motion relies on two mistaken assumptions: 1) that Section 1983 plaintiffs like Joseph cannot seek declaratory and injunctive relief based on a termination from employment under *Ex Parte Young*; and 2) that Joseph is only seeking "legal damages." Defs' Memo. at 8. The first assumption is wrong, as described above, under binding Eighth Circuit precedent. The second assumption is false because, in fact, Joseph is expressly seeking—and *only* seeking—declaratory and related injunctive relief against DPS. *See* Amend. Comp. at ¶¶80–88. Even if Defendants have a question about the exact relief Joseph is seeking, this information is properly ascertained in the course of litigation, not by dismissing Joseph's claim on a technicality. *See S.A.A. v. Geisler*, 127 F.4th 1133, 1137–38 (8th Cir. 2025).[3]

Therefore, Defendants' Rule 12 motion to dismiss Plaintiff's Section 1983 claim against DPS fails and must be denied because sovereign immunity does not bar a claim seeking declaratory and injunctive relief.

---

[3] During the parties' meetings conferring on Defendants' Rule 12 motions, Plaintiff's counsel has pointed that she is seeking (and only seeking) declaratory and injunctive relief against DPS, and further specified that potential relief includes reinstatement to her position at DPS. Likewise, Plaintiff's counsel pointed out this can be spelled out in more detail during the course of discovery.

**B. Plaintiff has stated claims against individual DPS officials under Section 1983 for retaliation in violation of her First Amendment rights.**

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75 (1964). Indeed, political speech, in particular, occupies the "highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913 (1982). Accordingly, the Supreme Court has long held that public employees do not abandon their First Amendment rights when they enter employment with the government. *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citations omitted). Thus, absent special circumstances, public employees must be free to speak on matters of public concern without fear of losing their government job because "free and open debate is vital to informed decision-making by the electorate." *Pickering v. Bd. of Ed.*, 391 U.S. 563, 571–572 (1968).

Here, to prevail on her First Amendment claim, Joseph will ultimately need to prove that: 1) she spoke on a matter of public concern (i.e., engaged in "protected activity"); 2) DPS fired her (i.e., took "adverse employment action" against her); and 3) her protected activity was a factor in the decision to fire her. *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020). With respect to individual defendants, she will also need to prove that they played a role in her termination. Here, courts construe "personal involvement" in a constitutional violation broadly to include not only executing an adverse action (as Babine allegedly did), but exercising authority to take the adverse action, directing others to take the adverse action, knowingly

14

acquiescing in the decision to take adverse action, or otherwise improperly influencing the decision to take the adverse action (as Rabb, Haltaufterheid, and Jacobson allegedly did). *See Mahn v. Jefferson Cnty., Missouri*, 891 F.3d 1093, 1100 (8th Cir. 2018); *MacMurray v. Bd. of Trs. of Bloomsburg State Coll.*, 428 F. Supp. 1171, 1175–76 (M.D. Pa. 1977).

Defendants' Rule 12 motion seeks to dismiss Joseph's First Amendment claim *not* on the basis that she fails to plausibly allege protected activity and *not* on the basis that she fails to plausibly allege adverse employment action. Defs'. Memo. at 8–13. Read charitably, Defendants make two arguments: (1) that Joseph fails to plausibly allege that *any* individuals (other than Kim Babine) played a role in her termination; and (2) that Joseph has failed to plausibly allege that her protected activity factored into the decision to fire her. *See generally id.* Both arguments are meritless. We address each in turn.

### C. Plaintiff has plausibly alleged that the following individuals played a role in her termination in violation of her First Amendment rights: Kim Babine, Rebecca Rabb, Jordan Haltaufterheid, and Commissioner Bob Jacobson.

Joseph plausibly alleges the individual defendants—Babine, Rabb, Haltaufterheid, and Jacobson—were personally involved in the violation of her constitutional rights. As stated above, courts construe "personal involvement" in a constitutional violation broadly to include not only executing an adverse action, but exercising authority to take the adverse action, directing others to take the adverse action, knowingly acquiescing in the decision to take adverse action, or otherwise improperly influencing the decision to take the adverse action. *See*

*Mahn v. Jefferson Cnty., Missouri*, 891 F.3d 1093, 1100 (8th Cir. 2018) (noting a state actor can be subject to § 1983 liability for retaliation where that actor "improperly influenced the decision-making process"); *MacMurray v. Bd. of Trs. of Bloomsburg State Coll.*, 428 F. Supp. 1171, 1175–76 (M.D. Pa. 1977) ("When an official directs his subordinates to commit acts or when he has actual knowledge of their acts and acquiesces in them he is regarded as having been personally involved and is liable for such acts."). Likewise, the Eighth Circuit has permitted claims to proceed against public officials who "recommend" an adverse action, but who lack final decision-making authority, *Darnell v. Ford*, 903 F.2d 556, 561–62 (8th Cir. 1990), as well as against public officials who unwittingly carried out the retaliatory recommendation of another. *Cox v. Dardanelle Pub. School Dist.*, 790 F.2d 668, 676 (8th Cir. 1986).[4]

*Kim Babine*. Taking the allegations in the Complaint as true, Kim Babine is the Director of the Office of Justice Programs. She reports to Commissioner Jacobson and his Chief of Staff (Haltaufterheid). Despite not supervising Joseph's employment, Babine executed the termination. Specifically, Babine scheduled Joseph's termination meeting,

---

[4] These cases align with more general, and potentially applicable doctrines, regarding when an unlawful motive can be said to have played a part in adverse employment action. *Cf. Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) (describing so-called Cat's Paw liability); *Roe v. Crawford*, 514 F.3d 789, 796 (8th Cir. 2008) (discussing so-called Heckler's Veto situations where "the government attempts to ban protected speech because it might provoke a violent response") (citing *Cohen v. California,* 403 U.S. 15, 23 (1971)); and *Lopez Prater*, 693 F. Supp. 3d at 1027 (discussing well-settled doctrine that employers may not take adverse action against employees because of the discriminatory preferences of third-parties) (citations omitted).

conducted the meeting, and gave the pretextual reason for the termination. Plaintiff has plausibly alleged that Babine participated in her termination. And Defendants do not argue otherwise.[5]

*Rebecca Rabb, Jordan Haltaufterheid, and Bob Jacobson.* Taking the allegations in the Complaint as true, Rabb is the DPS Deputy Director of External Relations, reports to Commissioner Jacobson and his Chief of Staff (Haltaufterheid), played a significant role in the decision to hire Joseph, introduced her to DPS staff at the start of her employment, and supervised her employment. Haltaufterheid is Commissioner Bob Jacobson's Chief of Staff, reports to Commissioner Jacobson, supervises Rabb and Babine, played a significant role in the decision to hire Joseph (like Rabb), introduced her to DPS staff at the start of her employment (like Rabb), and supervised her employment (like Rabb). Finally, Joseph alleges that Commissioner Jacobson is in charge of DPS, supervises Haltaufterheid, Rabb, and Babine, knew about the Gun Caucus campaign to get Joseph fired, and, at minimum, found it "interesting."

When Joseph discovered the Gun Caucus campaign to get her fired in early September, she alerted her superiors at DPS. Days later, on September 8, 2025, Joseph received a message from a friend warning her about a potential threat to her safety relating to the Gun Caucus

---

[5] On the other hand, Defendants argue that the claim against Babine fails because Plaintiff's protected activity did not play a role in Babine's actions. This argument is addressed more generally below in Section I.d.

campaign to get her fired. She again passed the information on to her superiors at DPS: letting them know that the "situation involving the Gun Owners Caucus and its followers was escalating, and, thus, that she was in the process of seeking an attorney for assistance." Haltaufterheid forwarded her concerns about the Gun Caucus to officials at DPS *outside of* Joseph's chain of command simply for their "situational awareness." By the end of the day, Joseph's superiors at DPS—including Rabb, Haltaufterheid, or Jacobson—had still not acknowledged receipt of her concerns, much less checked on her well-being, or done something to help her. Fearing for the safety of herself and her family, Joseph filed a petition for a harassment restraining order (HRO), and, further, reported her concerns about the Gun Caucus to Human Resources and the Office of the Minnesota Attorney General.

The following morning, September 9, 2025, Joseph informed DPS she was planning to work from home while waiting for a decision on her petition for an HRO. Mere hours later and out of nowhere, someone outside of Joseph's chain of command—who had *not* been supervising her employment (namely, Babine)—scheduled a meeting with Joseph, fired her, and gave a pretextual reason for the termination. When pressed to explain the factual basis for the termination, Babine could not provide one.

Based on the foregoing facts, Joseph then alleges *on information and belief* that Babine did not decide to terminate Joseph by herself, but, rather, did so at the direction of, or at least with the approval of, people in Joseph's chain of command at DPS, namely, Rabb,

18

Haltaufderheid, and Jacobson. After all, common sense says that people outside of an employee's chain of command are not likely to (a) have unilateral authority to fire the employee; (b) decide to fire an employee without input from people in the employee's chain of command; (c) fire an employee without being directed to do so by people in the employee's chain of command; or (d) have, much less provide, a pretextual reason for the termination without being told to do so by people in the employee's chain of command.

Moreover, given the political ramifications of hiring Joseph at DPS to combat gun violence and then apparently firing her at the behest of the Gun Caucus, common sense also suggests, at minimum, that Rabb was not likely to (e) fire Joseph without consulting Haltaufderheid (Commissioner Jacobson's Chief of Staff), and, further, that Haltaufderheid was not likely to (f) have approved Joseph's termination without consulting Commissioner Jacobson. Thus, not only is it plausible that the people in Joseph's chain of command participated in her termination, but the alternative is wholly improbable.[6]

Yet, Defendants argue that Joseph's First Amendment claim against the people in her chain of command at DPS must be dismissed with prejudice because she describes some of her allegations as being made "on information and belief." Rarely do parties misstate the law so

---

[6] Plaintiff's counsel has repeatedly asked Defendants' counsel whether they are even denying that people in Joseph's chain of command participated in her termination. To date, Defendants' counsel has refused to answer this simple question, saying, in short, that they do not have to address the factual allegations in Plaintiff's complaint while their Rule 12 motion is pending.

badly without sanction. In support of their argument, Defendants cite *Cole v. Does*, 571 F. Supp. 3d 1033 (D. Minn. 2021) (Schiltz, J.) and *Drobnak v. Andersen Corp.,* 561 F.3d 778 (8th Cir. 2009). But contrary to Defendants' logic, these cases do not say, much less hold, that claims "based on facts alleged on information and belief" must be dismissed under Rule 12. *See generally id.* As explained in *Cole*, they say, quite literally and explicitly, the exact opposite. *Id.* at 1039–41. Indeed, they say that even when a claim must meet the *heightened pleading standard* under Rule 9, the claim may still be based, in part, on facts alleged "on information and belief." *Id.* "Obviously, if allegations pleaded on information and belief can satisfy the heightened pleading standard of Rule 9(b)," allegations such as Joseph's "can satisfy the lower pleading standard of Rule 8." *Id.* at 1040. This is particularly true where, as here, the facts at issue "tend systemically to be in the sole possession of [Defendants]...." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

Alternatively, Defendants might argue that Joseph's First Amendment claims must be dismissed with prejudice because she does not "identify" any "information" that forms a basis for alleging certain facts "on information and belief." But this argument would be no less absurd. For, as described in detail above, Joseph's complaint contains numerous factual allegations forming the basis for her belief that people in her chain of command at DPS participated in the termination.

In sum, Defendants' attempts to slice and dice the analysis of Joseph's First Amendment claim against one official at a time is unavailing, because, as alleged, they all acted together.

### D. Plaintiff has plausibly alleged that DPS fired her because she engaged in activity protected by the First Amendment.

Liability attaches for employment retaliation under the First Amendment when an employee's First Amendment activity, or even her perceived First Amendment activity,[7] played a part in the employer's decision to take adverse employment action against her. *See Altonen v. City of Minneapolis,* 487 F.3d 554, 560 (8th Cir. 2007) (articulating the standard).[8]

Although Joseph did need to plead facts sufficient to prove retaliatory motive, she has, in fact, done so. DPS hired Joseph to be its first ERPO Coordinator after evaluating 30 candidates and thoroughly vetting them all. Both Rabb and Haltaufterheid played key roles in this process. Not only did DPS conclude that Joseph was the best candidate for the job, they concluded that it is very difficult to find people with the necessary "background and experience for the position," and, further, that they needed to offer Joseph "the best possible salary to not lose such a qualified candidate." This was the view of DPS at the time Joseph started

---

[7] *See generally Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016) ("When an employer demotes an employee out of a desire to prevent the employee from engaging in protected political activity, the employee is entitled to challenge that unlawful action under the First Amendment and § 1983 even if, as here, the employer's actions are based on a factual mistake about the employee's behavior.").

[8] A public employer may still escape liability if it can prove that it would have taken the same adverse action "regardless of the protected conduct." *Id.* at 560–61.

employment in mid August 2025. DPS fired her less than one month later. What happened—and what did not happen—in the meantime is critical to understanding why DPS fired Joseph.

What *did* happen is that the Gun Caucus started a malicious political campaign to get their long-time political opponent on public policy relating to gun violence (namely, Joseph) fired from DPS. The campaign began on August 31, 2025. All superiors in Joseph's chain of command, up to Commissioner Jacobson, knew about the Gun Caucus campaign. By September 8, with threatening rhetoric against Joseph rising (e.g., give her "both barrels," "Light her up!" etc.), she feared not just for her job, but for her personal safety and that of her family. Joseph reported these concerns to her superiors at DPS and informed them that she was seeking an attorney for assistance. She also made a report to Human Resources; a separate report to the Office of the Attorney General; and filed a petition for an HRO in district court. Yet, nobody from DPS reached out to Joseph to acknowledge receipt of her concerns, much less to help her. (This suggests coordinated behind-the-scenes discussions.) Then, on September 9, Joseph informed her superiors that she planned to work from home while waiting for a decision on her petition for an HRO. Hours later, DPS fired her: claiming that she has "an **inability** to build relationships with partners."

Now, what did *not* happen during Joseph's employment at DPS before her termination:

- DPS never warned her about failing to build relationships with ERPO partners;

- DPS never coached her on the ability to build relationships with ERPO partners;

- DPS never suggested that she was failing to build relationships with ERPO partners;

- And, more broadly, DPS never suggested that *any* aspect of Joseph's performance as ERPO Coordinator was unsatisfactory.

Indeed, as alleged in the complaint, Joseph worked well with ERPO partners throughout her employment at DPS. Thus, as further alleged in the complaint, DPS has offered no legitimate basis for saying that Joseph has "an **inability** to build relationships with partners." That explanation is false and pretextual. Indeed, less than two months after her termination, Joseph appeared at a town hall on preventing gun violence with Minnesota Attorney General Keith Ellison. Afterwards, Attorney General Ellison praised Joseph's contributions to the event, gave her a business card, and invited her to connect with his Office about ERPO.

Such proof of pretext, especially in light of the temporal proximity of the Gun Caucus expressing their version of a Heckler's Veto,[9] can suffice for a plaintiff like Joseph to prevail at

---

[9] Defendants suggest without any authority whatsoever that Joseph's pre-employment First Amendment activity cannot serve as predicate for her retaliation claim, because some of her superiors knew about it and still hired her. Defs.' Memo. at 11. Of course, this argument ignores (1) that DPS hired Joseph *before* the Gun Caucus decided to express its Heckler's Veto and (2) that Joseph also made related reports about the Gun Caucus during her employment that could be First Amendment protected activity.

trial. *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 543–45 (Minn. 2001). But even if the facts alleged in Joseph's complaint were still somehow "consistent with" a lawful termination, that still would *not* "render [Joseph's] claim implausible" under Rule 12, because nothing in the complaint suggests an "obvious [and legitimate] alternative explanation" for the decision to terminate her. *See Wilson*, 850 F.3d at 373–74 (citations and internal quotations omitted) (reversing district court's decision to dismiss plaintiff's retaliation claim under Rule 12).

Therefore, Defendants' Rule 12 motion to dismiss Plaintiff's First Amendment claim fails and must be denied, because Defendants are on fair notice of the claim and the grounds on which it rests.

## II. Plaintiff has stated a claim for disability discrimination under the Minnesota Human Rights Act (MHRA).

The MHRA forbids employers from discharging employees because of disability. Minn. Stat. § 363A. 08. The MHRA defines "disability" broadly to mean "any *condition* or *characteristic* that renders a person a disabled person." Minn. Stat. § 363A.03, subdiv. 12. A disabled person is further defined as someone who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities, (2) a record of such impairment, or (3) is *regarded as* having such an impairment. *Id.* (emphasis added). For example, a person is disabled under the MHRA if their employer regards them as materially limited in the major life activity of working. *See Hoover v. Norwest Private Mortg. Banking*, 632

N.W.2d 534, 543–45 (Minn. 2001); *Hoover v. Norwest Private Mortg. Banking*, 605 N.W. 2d 757, 762–63 (Minn. Ct. App.). Accordingly, if a person is regarded as being unable to lift heavy objects (say, greater than 50 pounds), then she is regarded as being materially limited in performing the class of jobs that require heaving lifting. See *Appendix to Part 1630, Title 29, Interpretive Guidance on Title I of the Americans With Disabilities Act*, "Substantially Limited in Working."

To prevail at trial on her MHRA claim, Joseph will need to show that she was fired (at least in part) because she was regarded as having such an impairment. A finding of animus or dislike, while probative, is not necessary. *Cooper v. USA Powerlifting*, 26 N.W.3d 604, 615 (Minn. 2025). All that is necessary is that one or more "considerations" related to the protected status motivated the decision. *LaPoint v. Fam. Orthodontics, P.A.*, 892 N.W.2d 506, 517 (Minn. 2017) (explaining why animus is not necessary for a motivating factor to be a "pregnancy-related consideration"). What is more, to be a motivating factor, a discriminatory consideration need not be a "but-for cause of the employer's conduct." *Id.* at 513. It need only play a part, as one factor among others, in the employer's decision to take adverse employment action. *See McGrath v. TCF Bank Sav., FSB*, 509 N.W.2d 365, 366 (Minn. 1993) (citing *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 627 (Minn. 1988)).

Defendants argue that Plaintiff has not plausibly alleged disability discrimination in violation of the MHRA because the phrase "fired … because of a disability" is "nearly identical

to one this court already found failed to meet the pleadings standard." Defs'. Memo. at 15 (citing *Radcliffe v. Securian Fin. Grp., Inc.,* 906 F. Supp. 2d 874, 886 (D. Minn. 2012). If all the complaint said was that DPS fired Joseph because of disability, then Defendants' argument might have some merit. But, of course, that is *not* all the complaint says, and, as such, Defendants' argument is meritless.

To their credit, Defendants acknowledge the complaint's discussion of Joseph's post-traumatic stress disorder (PTSD). But, then, they argue that Joseph's disability discrimination claim must be dismissed because there are "no factual allegations *connecting the dots* between Plaintiff's alleged PTSD and her employment, let alone her termination." Defs'. Memo. at 14–16 (emphasis added). Put charitably, Defendants' phrase "connecting the dots" is doing an awful lot of illicit work here.

Once again, to survive a Rule 12 motion to dismiss, a plaintiff need not plead facts that prove *all* elements of even a *prima facie* case of disability discrimination, much less her entire claim. *See EEOC v. BNSF Ry. Co.*, 150 F.4th 948, 961–62 (8th Cir. 2025), reh'g denied, No. 24-2082, 2025 WL 3085999 (8th Cir. Nov. 5, 2025) (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002)). Yet, again, even though Joseph did need to plead facts that could prove discriminatory motive, she has, in fact, done so. *See* the discussion of *pretext* above, which applies here with the same force here. Moreover, a plaintiff can "prove discriminatory intent ... by direct evidence." *Cooper*, 26 N.W.3d at 615 (citing *Hoover*, 632 N.W.2d at 542 (internal

quotations omitted)). "Direct evidence ... establishes that the [reprisal] was purposeful, intentional, or overt." *Id.* (citing *Hanson v. Dep't of Nat. Res.*, 972 N.W.2d 362, 373 (Minn. 2022) (internal quotations omitted)). For example, there is direct evidence of an unlawful motive where a decisionmaker admits that a plaintiff's protected status was one of the criteria used to make a decision to take adverse action. *See id.* at 615 (citing *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 61 (1st Cir. 2000)).

In this case, at Joseph's termination meeting, DPS told her explicitly that she was being fired because she had "an **inability** to build relationships with partners," which would, by definition, render Joseph unable to perform any jobs that require her to build relationships with people. This statement is thus *direct evidence* of disability discrimination. First, it suggests that DPS regarded Joseph as having a "condition or characteristic" that prevents her from building relationships with people, and, thus, from being able to perform any job that requires building such relationships. Second, it suggests that the impairment is at least one of the reasons—if not the only reason—for terminating Joseph's employment. This interpretation of the purported reason for termination is further bolstered by the context in which it was given.[10]

As discussed in detail above, DPS hired Joseph as its first ERPO Coordinator after a careful vetting process, because they believed she was eminently qualified for the position.

---

[10] This does not mean that the statement could not possibly have any other meanings. But, again, plaintiffs are not required to disprove all other interpretations of the statement, much less at this stage of the proceedings. *Wilson*, 850 F.3d at 373–74.

Then, less than a month later, DPS fired Joseph because they had apparently come to regard her as having "an **inability** to build relationships with partners." Again, understood as relating to a performance-based reason for termination, the statement is false and pretextual. DPS never gave (much less had) a performance-based reason for coming to the conclusion that Joseph could not build relationships with people. Instead, as alleged in the complaint, DPS came to this conclusion after apparently buying into the discriminatory stereotype that Joseph, who was known to have PTSD and who the Gun Caucus described as a "nutjob," could not build relationships with people.[11]

Therefore, Defendants' Rule 12 motion to dismiss Plaintiff's MHRA claim fails and must be denied, because Defendants are on fair notice of the claim and the grounds on which it rests.

## **CONCLUSION**

For the foregoing reasons, Defendants' Rule 12 partial motion to dismiss must be denied in its entirety.

*[Signature on the following page.]*

---

[11] Again, as above, liability may attach either (i) directly or (ii) indirectly via a Cat's Paw or related theory of the sort described above in footnote 4.

Date: March 3, 2026                      *s/Matthew A. Frank*
                                         Matthew A. Frank (MN# 0395362)
                                                matt@premofrank.com
                                                (612) 445-7041
                                         Stephen M. Premo (MN# 0393346)
                                                stephen@premofrank.com
                                                (612) 445-7042
                                         401 Minneapolis Grain Exchange
                                         400 South Fourth Street
                                         Minneapolis, MN 55415