**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Rachael Joseph, | Case No. 26-cv-18 (JWB/SGE) |
| Plaintiff, | |
| vs. | **DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT** |
| Department of Public Safety (State of Minnesota); Bob Jacobson, Commissioner, in his official and individual capacity; Jordan Haltaufderheid, in his official and individual capacity; Kim Babine, in her official and individual capacity; and Rebecca Rabb, in her official and individual capacity, | |
| Defendants. | |

**ANSWER**

Defendants Minnesota Department of Public Safety, Bob Jacobson, Commissioner, in his official and individual capacity; Jordan Haltaufderheid, in his official and individual capacity; Kim Babine, in her official and individual capacity; and Rebecca Rabb, in her official and individual capacity (collectively "Defendants"), as and for their Answer to Plaintiff's Amended Complaint, admit, deny, and allege as follows:

Except as hereinafter expressly admitted, qualified, denied, or otherwise answered, Defendants deny each and every allegation in the Amended Complaint.

**PARTIES**

1.      Plaintiff Rachael Joseph is an adult individual who resides in Hennepin County, Minnesota.

1

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1, and therefore deny the same.

2. Defendant Minnesota Department of Public Safety ("DPS" or "the Department") is an agency of the State of Minnesota. According to DPS, its core mission is to "build a safer Minnesota." DPS headquarters are located in St. Paul, Ramsey County, Minnesota.

**ANSWER:** Defendant Minnesota Department of Public Safety has been dismissed by Order of the Court, and therefore no response is required.

3. On information and belief, Defendant DPS Commissioner Bob Jacobson is an adult individual who resides in Ramsey County and is domiciled in the State of Minnesota. He is in charge of DPS.

**ANSWER:** Defendants admit that Defendant Bob Jacobson is the Commissioner of the Minnesota Department of Public Safety, and his duties are defined by statute, e.g. Minn. Stat. § 299A.01. Defendant Jacobson performs the bulk of those duties in Ramsey County. Defendants deny the remaining allegations in paragraph 3.

4. On information and belief, Defendant Jordan Haltaufterheid is an adult individual who resides and is domiciled in the State of Minnesota. Haltaufterheid is the Chief of Staff to DPS Commissioner Bob Jacobson and supervised Plaintiff's employment.

**ANSWER:** Defendants admit that Defendant Haltaufderheid[1] is the Chief of Staff for the Minnesota Department of Public Safety. Defendant Haltaufderheid performs the bulk of those duties in Ramsey County. Defendants deny the remaining allegations in paragraph 4.

5. On information and belief, Defendant Rebecca Rabb is an adult individual who resides and is domiciled in the State of Minnesota. Rabb is the Deputy Director of External Relations, supervised Plaintiff's employment, and reports to Haltaufterheid and Jacobson.

---

[1] The proper spelling is Haltaufderheid.

**ANSWER:** Defendants admit that Defendant Rebecca Rabb is the Deputy Director of External Relations - Office of Justice Programs and was Plaintiff's supervisor. Defendant Rabb performs the bulk of her duties in Ramsey County. Defendants deny the remaining allegations in paragraph 5.

6.     On information and belief, Defendant Kim Babine is an adult individual who resides and is domiciled in the State of Minnesota. Babine is now the Director of the Office of Justice Programs and reports to Haltaufterheid and Jacobson.

**ANSWER:** Defendants admit that Defendant Kim Babine is the Executive Director of the Office of Justice Programs and indirectly reports to Commissioner Jacobson. Defendant Babine performs the bulk of those duties in Ramsey County. Defendants deny the remaining allegations in paragraph 6.

7.     At all relevant times, Plaintiff was an employee of DPS.

**ANSWER:** Defendants admit Plaintiff was an employee of DPS from August 13, 2025 to September 9, 2025. Defendants deny the remaining allegations in paragraph 7.

## JURISDICTION AND VENUE

8.     Following removal to federal court by Defendants, this Court has personal jurisdiction over Defendants, subject-matter jurisdiction over Plaintiff's federal claims, and supplemental jurisdiction over Plaintiff's state claims. Venue is also proper here.

**ANSWER:** Admit.

9.     At commencement, this case was located in Ramsey County District Court, which had personal jurisdiction over Defendants and original subject-matter jurisdiction over Plaintiff's claims. Venue was also proper in Ramsey County because DPS resides there, and, separately, because at least some of the events giving rise to Plaintiff's claims occurred there.

**ANSWER:** Defendants admit that the case commenced in Ramsey County District Court. The remaining allegations in paragraph 9 set forth legal conclusions to which no response is required, and Defendants therefore deny.

### FACTS

*Plaintiff's Aunt Shelley.*

10.     Plaintiff's aunt, Shelley Joseph-Kordell ("Aunt Shelley"), worked as a geriatric care manager in the Twin Cities. Her clients were elderly adults and couples who needed assistance with daily living.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10, and therefore deny.

11.     In the early 2000s, a disturbed and disgruntled daughter of one such couple started harassing Aunt Shelley. Her name was Susan Berkovitz. Berkvovitz [sic] began threatening Shelley, leaving dead animals on her doorstep, and filing frivolous court cases against her.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11, and therefore deny.

12.     On September 29, 2003, Aunt Shelley went to the Hennepin County Government Center for a hearing in one of the frivolous cases.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12, and therefore deny.

13.     Fearing Berkovitz, Shelley and her lawyer requested security to escort them to the courtroom on the 17th floor of the Government Center. At the time, there were no metal detectors in the building.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13, and therefore deny.

14.     After arriving on the 17th floor, Shelley went to the women's restroom and asked security to guard the door.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14, and therefore deny.

15.    Shelley's lawyer remained in the hallway outside the courtroom.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15, and therefore deny.

16.    As he looked down to leaf through documents in his briefcase, Berkovitz walked up and shot him in the neck. He survived.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16, and therefore deny.

17.    Moments later, however, Berkovitz entered the women's restroom unimpeded and shot Shelley to death.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17, and therefore deny.

***Plaintiff Rachael Joseph.***

18.    Plaintiff Rachael Joseph is a Jewish woman with a young family.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18, and therefore deny.

19.    Since the murder of her Aunt Shelley, Joseph has suffered from PTSD relating to gun violence.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19, and therefore deny.

20.    Following the murder, Joseph and her family—led by Geri Joseph, Plaintiff's grandma and Aunt Shelley's mom—campaigned to get Hennepin County to install metal detectors at the Hennepin County Government Center. They succeeded.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20, and therefore deny.

21.    Years later, Joseph began working to shape the law in ways to prevent people from becoming victims of gun violence like her Aunt Shelley.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21, and therefore deny.

22.    Over the past decade, Joseph has:
- o    Drafted and consulted on gun safety legislation in Minnesota;
- o    Organized and participated in public campaigns a) supporting legislation to reduce gun violence (e.g., universal background check and ERPO laws2) and b) opposing legislation that risked increasing gun violence (e.g., permitless carry and stand-your-ground laws);
- o    Authored editorials, interviewed with news media, engaged in public debate on social media, spoken at public rallies, and testified in public hearings relating to gun violence legislation;
- o    Developed and provided survivor- and trauma-informed trainings for public agencies, organizations, and community groups; and
- o    Educated law enforcement and local stakeholders on ERPO laws.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22, and therefore deny.

### *DPS hires Rachael Joseph as ERPO Coordinator.*

23.    Beginning in 2024, Minnesotans have been able to petition a court for an ERPO prohibiting a person from purchasing or possessing a firearm during a period of crisis when the person poses an extreme risk to themselves or others.

**ANSWER:** Defendants admit that Minnesota Statutes section 624.7171 was effective January 1, 2024, and sets forth Minnesota's law regarding Extreme Risk Protection Orders.

6

The remainder of paragraph 23 sets forth a legal conclusion to which no response is required. To the extent a response is required, Defendants deny.

24. A year or so later, in spring 2025, DPS began soliciting applications for an ERPO Coordinator position. The purpose of the ERPO Coordinator position was to provide statewide coordination, education, and support for Minnesota's new ERPO law. The position had nothing to do with confiscating guns in particular cases.

**ANSWER:** Defendants admit.

25. Joseph applied for the job.

**ANSWER:** Defendants admit.

26. On or around June 4, 2025, Joseph interviewed with Jordan Haltaufderheid (DPS Chief of Staff), Rebecca Rabb (DPS Deputy Director of External Relations), and Tony Benson (DPS Communications Specialist).

**ANSWER:** Defendants admit.

27. A few weeks later, on or around June 25, 2025, Joseph sat for a second interview: this time with Haltaufderheid, Rabb, and Suzanne Elwell (DPS Director of the Crime Victim Justice Unit).

**ANSWER:** Defendants admit.

28. DPS thoroughly vetted candidates for the role of ERPO Coordinator. Of the 30 people who applied, DPS concluded that only 5 were at least minimally qualified, and, ultimately, that Joseph was the best candidate for the job.

**ANSWER:** Defendants admit thirty people applied for the position and five met the position's minimum qualifications. Of those five, DPS determined Plaintiff should be offered the position. Defendants deny all remaining allegations in paragraph 28.

29. When evaluating Joseph for the position, DPS concluded the following about her qualifications for the job:
   ○ Joseph has "extensive knowledge on Minnesota's ERPO laws";
   ○ Joseph has been "heavily involved in [related] policy changes, legislative advocacy, community partnership and training"; and

7

- ○ Joseph's background and experience—evaluating public programs, advancing trauma informed services, developing and delivering training— "will be extremely valuable to this position[.]"

**ANSWER:** Paragraph 29 contains quotes from an unidentified document. The document speaks for itself and Defendants deny anything inconsistent therewith. Defendants deny all remaining allegations in paragraph 29.

30.    More generally, DPS concluded that it is "very hard to find" people with the "background and experience required for this position," and, further, that "we need to offer [Joseph] the best possible salary to not lose such a qualified candidate."

**ANSWER:** Paragraph 30 contains quotes from an unidentified document. The document speaks for itself and Defendants deny anything inconsistent therewith. Defendants deny all remaining allegations in paragraph 30.

31.    On or around July 15, 2025, the Department sent a letter to Joseph confirming her hire as ERPO Coordinator for the State of Minnesota in the Department's Office of Justice Programs.

**ANSWER:** Defendants admit DPS sent a letter on July 14, 2025, confirming Joseph's acceptance of the position entitled State Program Admin Coordinator – Extreme Risk Protection Order Coordinator with the Department of Public Safety, Office of Justice Programs Division.

32.    On August 13, 2025, Joseph started her job as ERPO Coordinator. During Joseph's first week on the job, DPS officials (including Rabb and Haltaufterheid) celebrated her expertise, introduced her as having "lived experience" relating to gun violence, and expressed how glad they were to have her on board.

**ANSWER:** Defendants admit Joseph began work at DPS on August 13, 2025. Defendants deny all remaining allegations in paragraph 32.

8

33.    Throughout Joseph's employment with DPS, she worked well with the Department's ERPO partners.

**ANSWER:**  Defendants deny.

***The Minnesota Gun Owners Caucus and its followers launch a defamatory campaign to get Joseph, their long-time political opponent, fired from DPS.***

34.    The Minnesota Gun Owners Caucus is a non-profit organization that claims its mission is to "defend and restore the right to keep and bear arms in Minnesota."

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore deny.

35.    The organization, its leadership, and their followers have long identified Joseph as their political opponent.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35, and therefore deny.

36.    For example, whereas Joseph publicly advocated for passage of Minnesota's ERPO law, the Gun Owners Caucus and their followers vehemently and publicly advocated against passage of the law.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36, and therefore deny.

37.    Beginning on or around August 31, 2025, the Gun Owners Caucus and its followers launched a defamatory campaign to get Joseph fired from DPS. They did so because of Joseph's long record in politics on the opposing side of legislation relating to gun violence, and, more specifically, because they did not want the ERPO law to succeed.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37, and therefore deny.

38.    On information and belief, at the time the Gun Owners Caucus and its followers launched their campaign against Joseph, the organization itself was in the process of negotiating a large six-figure settlement with DPS in an unrelated case.

**ANSWER:** Defendants deny.

39.    When Joseph discovered the campaign against her, she alerted her superiors at DPS. They never responded.

**ANSWER:** Defendants admit that Joseph emailed Defendants Haltaufderheid and Rabb, stating in "Just an FYI" that "the gun rights extremists have discovered where I work so I imagine the Commissioner will get a few emails from this [linked] petition." Defendants deny all remaining allegations in paragraph 39.

40.    When DPS Commissioner Bob Jacobson initially learned about the campaign against Joseph, he reacted by saying, "Well that's interesting." Commissioner Jacobson never reached out to Joseph to see if she was okay.

**ANSWER:** Paragraph 40 contains Plaintiff's summary of email correspondence and characterization of her case. The email correspondence speaks for itself, and Defendants deny anything inconsistent therewith.

41.    Early on the morning of September 8, 2025, Joseph received a message from a friend about a potential threat to her safety relating to the campaign to get her fired.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41, and therefore deny.

42.    Joseph's friend informed her that a person had attempted to post an antisemitic comment about Joseph online in response to a 2017 article on www.tcjewfolk.com. The message read: "How is this **nutjob** in charge of **red flag confiscation** in MN now? Don't even get started on the **Jewish side** of things for her. . . . This woman . . . should never be allowed in any type of authority at all," (emphasis added).

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42, and therefore deny.

43.    Around 9:18 a.m. that morning, Joseph passed this information on to her superiors at DPS. She let them know that the situation involving the Gun Owners Caucus and its

10

followers was escalating, and, thus, that she was in the process of seeking an attorney for assistance.

**ANSWER:** Paragraph 43 is Plaintiff's summary of email correspondence. The email

correspondence speaks for itself and Defendants deny anything inconsistent therewith.

44.    Two minutes later, around 9:20 a.m., Chief of Staff Haltaufderheid forwarded Joseph's email to Cassandra O'Hern (Deputy Commissioner) and Timothy Lynaugh (Assistant Commissioner).

**ANSWER:** The email referenced in paragraph 44 speaks for itself, and Defendants deny

anything inconsistent therewith.

45.    Haltaufderheid did not express concern for Joseph in the email. Nor did he solicit feedback or assistance from O'Hern or Lynaugh. All he said was: "FYSA," which meant, "For your situational awareness."

**ANSWER:** Paragraph 45 contains Plaintiff's characterization of email correspondence.

The email referenced in paragraph 45 speaks for itself, and Defendants deny anything

inconsistent therewith.

46.    Still, Deputy Commissioner O'Hern replied: declaring that "we need to make sure that [Joseph] has all the EAP resources she needs," and asking whether they should forward the information to "Fusion." But DPS did neither.

**ANSWER:** Paragraph 46 contains Plaintiff's characterization of email correspondence.

The email referenced in paragraph 46 speaks for itself, and Defendants deny anything

inconsistent therewith.

47.    On information and belief, by Fusion, O'Hern was referring to the Minnesota Fusion Center, which is a division of the Minnesota BCA that works with law enforcement, first responders, government agencies, and the private sector to share "resources, expertise, and information with the goal of maximizing their ability to detect, prevent, investigate, and respond to criminal . . . activity."

11

**ANSWER:** Defendants admit the Minnesota Fusion Center is a division of BCA that works with law enforcement, first responders, government agencies and the private sector. Paragraph 47 quotes from an unknown source, which speaks for itself and Defendants deny anything inconsistent therewith and all other allegations in Paragraph 47.

48.     Meanwhile, members of the Gun Owners Caucus and its followers were posting increasingly threatening comments about Joseph online. For example:
   o     Joseph is "evil," "full Gestapo," a "paid terrorist," a "traitor," and a "Red Flag transvestite";
   o     "Time to stop being nice and polite!"
   o     "This means WAR!!!";
   o     "I AM PAST THE POINT OF JUST WANTING [HER] IN PRISON," *next to a photo of a hangman's platform and noose*;
   o     Give her "both barrels";
   o     "Light her up!" and
   o     "Tell that twatwaffle bitch to leave her doors unlocked at night. Let's see how she feels after that."

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48, and therefore deny.

49.     By the end of the day on September 8, 2025, Joseph had reported concerns about the campaign against her to superiors at DPS, Human Resources at DPS, and the Office of the Minnesota Attorney General.

**ANSWER:** Defendants admit that Joseph had sent emails to Defendants Rabb and Haltaufderheid; the emails speak for themselves and Defendants deny anything inconsistent therewith. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 49, and therefore deny.

50.     In fear for the safety of herself and her family, Joseph had also filed a petition for a harassment restraining order (HRO) against the Gun Owners Caucus and its followers.

12

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50, and therefore deny.

51.     Incredibly, neither Haltaufderheid nor Rabb nor anyone else at DPS ever so much as acknowledged receipt of Joseph's concerns about the campaign against her, much less followed up to understand her concerns in more depth or provide her with any resources.

**ANSWER:** Defendants deny.

52.     The next morning, September 9, 2025, Joseph informed DPS that she was planning to work from home while waiting for a decision on her petition for an HRO.

**ANSWER:** Defendants admit Joseph informed Rabb that she would be working remotely "until the HRO is granted against the gun extremists." Defendants deny any remaining allegations in paragraph 52.

53.     A few hours later, Kim Babine scheduled a virtual meeting with Joseph for 2:30 p.m. that afternoon. Babine did not explain the reason for the meeting.

**ANSWER:** Defendants admit.

54.     When Joseph arrived for the meeting, Director Babine fired her.

**ANSWER:** Defendants admit that Defendant Babine notified Joseph that she would not be certified in her probationary position and her appointment was to end. Defendants deny the remainder of paragraph 54.

55.     Babine claimed that DPS had concluded that Joseph has "an **inability** to build relationships with partners."

**ANSWER:** Defendants admit Babine communicated that DPS was ending Joseph's probationary position due to her inability to build relationship with partners.

56.     When Joseph asked, "Which partners?", Babine could not name any. Then, when Joseph suggested that DPS appeared to be taking the side of people who wanted the ERPO law to fail, Babine responded with silence.

13

**ANSWER:** Defendants admit that Babine did not respond to the question or alleged suggestion contained in paragraph 56. Defendants deny all remaining allegations in paragraph 56.

57.    Not only did DPS appear to be crediting the Gun Owners Caucus and their followers' political preferences when firing Joseph, they also appeared to have bought into the stereotype that Joseph was a "nutjob" with PTSD who has what they themselves described as "an **inability** to build relationships." This would of course render Joseph unable to perform a whole class of jobs, namely, those that require her to build relationships with people.

**ANSWER:** Paragraph 57 relates to Count III for MHRA disability discrimination, which was dismissed by Order of the Court, therefore, no response is required. To the extent a response is required, Defendants deny.

58.    On information and belief, Babine did not terminate Joseph by herself. She did so at the direction of Joseph's direct supervisor (Rabb), Rabb's superior (Haltaufderheid), and Haltaufderheid's direct supervisor (Jacobson), or, at minimum, with their approval.

**ANSWER:** Defendants admit the first sentence of paragraph 58. Defendants deny all remaining allegations in paragraph 58.

59.    On information and belief, Babine did not come up with a purported reason for terminating Joseph by herself. She did so at the direction of Joseph's direct supervisor (Rabb), Rabb's superior (Haltaufderheid), and Haltaufderheid's direct supervisor (Jacobson), or, at minimum, with their approval.

**ANSWER:** Defendants admit the first sentence of paragraph 59. Defendants deny all remaining allegations in paragraph 59.

60.    Before terminating Joseph, DPS never disciplined Joseph for failing to build relationships with ERPO partners.

**ANSWER:**  Defendants admit.

14

61.    Before terminating Joseph, DPS never warned her about failing to build relationships with ERPO partners.

**ANSWER:** Defendants admit.

62.    Before terminating Joseph, DPS never coached her on the ability to build relationships with ERPO partners.

**ANSWER:** Defendants admit.

63.    And, before terminating Joseph, DPS never so much as suggested that she was somehow failing to build relationships with ERPO partners.

**ANSWER:** Defendants admit.

64.    More broadly, before terminating Joseph, DPS never suggested that *any* aspect of her performance as ERPO Coordinator was unsatisfactory.

**ANSWER:** Defendants deny.

65.    Following her termination, Joseph made a Data Practices Act request for all documents relating to her employment at DPS.

**ANSWER:** Defendants admit.

66.    In response, DPS failed to produce a single document suggesting that Joseph had any performance problems. Likewise, DPS failed to produce a single document reflecting the process it went through when deciding to terminate Joseph, who was involved in the decision, and why they did it.

**ANSWER:** Paragraph 66 asserts Plaintiff's characterization of her case and no response is required. To the extent a response is required, Defendants deny.

67.    In any case, the reason DPS gave for Joseph's termination is both false and pretextual.

**ANSWER:** Defendants deny.

68.    Indeed, in the months following her termination, Joseph was invited as a private citizen by the Mayor of Mounds View to speak about ERPO at an educational town hall.

15

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68, and therefore deny.

69.     Joseph appeared in Mounds View on a panel that included Minnesota Attorney General Keith Ellison. Her appearance and presentation were similar to the work she was tasked with doing as ERPO Coordinator at DPS.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69, and therefore deny.

70.     Followers of the Gun Owners Caucus attended the event. They sat in the crowd leering at Joseph, took photographs of her, and again declared on social media that she is an "**anti-gun activist nut**."

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70, and therefore deny.

71.     Others commended Joseph for her work. This included Attorney General Ellison: who praised Joseph's presentation, gave her a business card, and even invited her to connect with his Office about ERPO.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71, and therefore deny.

72.     As a result of Defendants' conduct, Plaintiff has suffered economic loss (including lost wages and benefits), emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, lost earning capacity, and other injuries.

**ANSWER:** Defendants deny that they engaged in any illegal conduct whatsoever, and therefore deny paragraph 72.

### CAUSES OF ACTION

**Count 1**
*Retaliation in violation of Minn. Stat. Section 181.931 et seq.*
*(DPS)*

16

73.    Plaintiff incorporates all of the foregoing allegations as if stated herein.

**ANSWER:** Defendant DPS incorporates by reference, and re-alleges, all prior responses to Paragraphs 1 through 72 of this Complaint.

74.    Section 181.931 *et seq.* prohibits employers from firing employees because they communicate about a suspected, actual, or planned violation of law, whether committed by the employer or a third party.

**ANSWER:** Paragraph 74 is a legal conclusion to which no response is required. To the extent a response is required, Defendant DPS states that Minnesota Statutes section 181.931 *et seq.* speaks for itself and Defendant DPS therefore denies all allegations in paragraph 74 inconsistent therewith.

75.    As alleged herein, Defendant was Plaintiff's employer.

**ANSWER:** Defendant DPS admits.

76.    As alleged herein, Plaintiff reported concerns about suspected, actual, or planned violations of law by the Gun Owners Caucus, its officers, or its followers. These violations of law include, but are not limited to, economic reprisal, tortious interference with employment, defamation, misuse of a charity, and crimes against a person.

**ANSWER:** Defendant DPS denies.

77.    As alleged herein, Defendant fired Plaintiff because she reported suspected, actual, or planned violations of law.

**ANSWER:** Defendant DPS denies.

78.    In doing so, Defendant acted with deliberate disregard for the rights or safety of others.

**ANSWER:** Defendant DPS denies.

79.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including the loss of income and benefits),

emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, and lost earning capacity.

**ANSWER:** Defendant DPS denies.

### Count II
### *Retaliation in violation of The First Amendment and 42 U.S.C. § 1983 (DPS, Bob Jacobson, Kim Babine, Jordan Haltaufterheid, and Rebecaa Rabb)[2]*

80.     Plaintiff incorporates all of the foregoing allegations as if stated herein.

**ANSWER:** Defendants incorporate by reference, and re-allege, all prior responses to Paragraphs 1 through 79 of this Complaint.

81.     The U.S. Constitution prohibits public employers from firing public employees because they exercise their First Amendment right to free speech.

**ANSWER:** Paragraph 81 is a legal conclusion to which no response is required. To the extent a response is required, Defendants state that the U.S. Constitution speaks for itself and Defendants therefore deny all allegations in paragraph 81 inconsistent therewith.

82.     As alleged herein, Defendant was Plaintiff's employer.

**ANSWER:** Defendants admit Plaintiff was employed by DPS. Defendants deny all remaining allegations in paragraph 82.

83.     As alleged herein, Plaintiff exercised her right to free speech under the First Amendment by speaking on matters of public concern relating to legislation and public policy on gun violence.

---

[2] DPS was dismissed from Count II by Order of the Court dated April 22, 2026 (ECF 24). Accordingly, the answers to paragraphs 80 through 88 are not interposed by Defendant DPS. To the extent responses are required, Defendant DPS denies.

**ANSWER:** Paragraph 83 is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny that they violated Plaintiff's rights under the First Amendment.

84.     At all relevant times, when deciding to fire Plaintiff, Defendants had final policy-making authority on the decision and took such action under color of state law.

**ANSWER:** Defendants deny.

85.     As alleged herein, Defendants fired Plaintiff because she exercised her right to free speech under the First Amendment.

**ANSWER:** Defendants deny.

86.     In doing so, Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights.

**ANSWER:** Defendants deny.

87.     As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including the loss of income and benefits), emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, and lost earning capacity.

**ANSWER:** Defendants deny.

88.     In so far as this claim is against people in their official capacities, DPS, or the State of Minnesota, Plaintiff does not seek money damages, but only declaratory, injunctive, or other available relief.

**ANSWER:** Paragraph 88 contains Plaintiff's characterization of her cause of action, to which no response is required. To the extent a response is required, Defendants deny.

### Count III
### *Disability Discrimination in Violation of Minn. Stat. §§ 363A.01 et seq. (MHRA) (DPS)*

89.     Plaintiff incorporates all of the foregoing allegations as if stated herein.

19

**ANSWER:** Because the Court has dismissed this Count, no response is required.  To the extent a response is required, Defendant DPS incorporates by reference, and re-alleges, all prior responses to Paragraphs 1 through 88 of this Complaint.

90.    The MHRA prohibits employers from firing employees because of disability.

**ANSWER:** Because the Court has dismissed this Count, no response is required.  To the extent a response is required, Defendant DPS denies the allegations in Paragraph 90.

91.    As alleged herein, Defendant was Plaintiff's employer.

**ANSWER:** Because the Court has dismissed this Count, no response is required.  To the extent a response is required, Defendant DPS admits that it previously employed Plaintiff.

92.    As alleged herein, Defendant regarded Plaintiff as having a disability.

**ANSWER:** Because the Court has dismissed this Count, no response is required.  To the extent a response is required, Defendant DPS denies the allegations in Paragraph 92.

93.    As alleged herein, Defendant fired Plaintiff because of disability.

**ANSWER:** Because the Court has dismissed this Count, no response is required.  To the extent a response is required, Defendant DPS denies the allegations in Paragraph 93.

94.    In doing so, Defendant acted with deliberate disregard for the rights or safety of others.

**ANSWER:** Because the Court has dismissed this Count, no response is required.  To the extent a response is required, Defendant DPS denies the allegations in Paragraph 94.

95.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, among other injuries, economic loss (including the loss of income and benefits), emotional distress, mental anguish, humiliation, embarrassment, discriminatory harm to dignity, harm to reputation, and lost earning capacity.

**ANSWER:** Because the Court has dismissed this Count, no response is required.  To the extent a response is required, Defendant DPS denies the allegations in Paragraph 95.

**AFFIRMATIVE DEFENSES**

Defendants allege the following affirmative and other defenses.

1.  The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

2.  Plaintiff's claims against Defendants may be barred, in whole or in part, by applicable immunity doctrines, including but not limited to, the Eleventh Amendment to the United States Constitution, qualified immunity, official immunity, vicarious official immunity, and/or other immunity doctrines.

3.  To the extent that Plaintiff seeks damages against the individual Defendants in their official capacities, those claims and any award of damages are barred by the Eleventh Amendment to the United States Constitution.

4.  Plaintiff's Complaint, claims, and causes of action may be barred, in whole or in part, by equitable defenses including the doctrines of laches, consent, unclean hands, waiver, estoppel, and/or other applicable equitable defenses.

5.  Any actions or inactions attributable to Defendants were not the direct and proximate cause of any damage to Plaintiff.

6.  To the extent Plaintiff prays for punitive damages, such claims are barred under Minn. Stat. § 3.736.

7.      If Plaintiff sustained damages, which Defendants deny, she has failed to mitigate her purported injuries or damages.

8.      If Plaintiff sustained damages, which Defendants deny, such injuries or damages were caused by Plaintiff's own fault or conduct of third parties over whom the Defendants exercised no control.

9.      Defendants had legitimate, non-discriminatory, and non-retaliatory reasons for each of the actions and decisions challenged in the complaint.

10.     At all times relevant to this action, Defendants acted in good faith and in compliance with all applicable laws.

11.     Defendants reserve any other available affirmative defenses or objections as may arise or are established by the facts of this case.

### DEFENDANTS' PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully request that this Court: (1) dismiss Plaintiff's Amended Complaint with prejudice and on the merits; (2) enter judgment in Defendants' favor with respect to all of the claims and causes of action set forth in the Amended Complaint; (3) award Defendants' costs, reasonable attorney fees and disbursements; and (4) any other relief that the Court deems just and proper under these circumstances.

*(signature on following page)*

Dated: May 6, 2026

KEITH ELLISON
Attorney General
State of Minnesota

 s/Amanda Prutzman
AMANDA PRUTZMAN
Assistant Attorney General
Atty. Reg. No. 0389267

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1217 (Voice)
(651) 282-5832 (Fax)
Amanda.Prutzman@ag.state.mn.us

ATTORNEY FOR DEFENDANTS

|#6348234-v1